IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

State Auto Property & Casualty,
    Plaintiff,

vs.                                           Case No. 13-4020-JTM

David Lewis, *et al.* ,
    Defendants.

MEMORANDUM AND ORDER

Joey Lowe was killed when the motorcycle he was riding struck a cow on Auburn Road in Shawnee County. The cow, which belonged to Shirley Bosworth, had escaped from pasture owned by David Lewis and Michelle Koelling and located in the vicinity of 7750 S.W. 61st Street in Topeka, Kansas. Individually and as the heirs at law of Joey Lowe, Debra Lowe and Kristopher Lowe filed a state court negligence action against Bosworth, Lewis and Koelling.

Plaintiff State Auto Property & Casualty subsequently brought this declaratory judgment action seeking a determination that the homeowners insurance policy issued to Lewis provides no coverage for the accident. The plaintiff has moved for summary judgment (Dkt. 29), which the court grants for the reasons provided herein.

*Jurisdiction*

As a preliminary matter, the court notes that it directed the parties to brief the jurisdiction of the court to hear the present action. After the summary judgment motion was filed, the United States Magistrate Judge entered the Pretrial Order indicating a lack of complete diversity, in that both State Auto and defendant Kristopher Lowe were

residents of the State of Iowa.

Although the court directed "each party" to make as showing as to the court's jurisdiction (Dkt. 40), only State Auto has complied. (Dkt. 41). In its response, State Auto argues that the court should exercise its inherent authority to dismiss Kristopher Lowe as a party pursuant to Fed.R.Civ.Pr. 41(a)(1)(B). Although submitted as a brief, State Auto's submission is effectively a motion, since it formally requests the dismissal of Lowe. (Dkt. 41, at 9). None of the defendants have filed any response to this request, or otherwise objected to the result.

For good cause shown, the court finds that Kristopher Lowe is not an indispensable party within the meaning of Fed.R.Civ.Pr. 19 and 21. Kristopher Lowe's interests are identically aligned with Debra Lowe, who remains in the action. Under K.S.A. 60-1902, the underlying action on behalf of Joey Lowe can be advanced "by any one of the heirs" at law. Accordingly, dismissal will not directly imperil the substantial interests of any party. In contrast, a failure to dismiss Kristopher Lowe will deprive the court of jurisdiction, and State Auto of an effective forum for resolution of its declaratory judgment action. Finally, dismissal will serve the interests of judicial economy, as the legal issues in the case have been fully briefed and the court is ready to rule.

*Summary Judgment*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable

doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The facts relating to State Auto's summary judgment motion are essentially uncontested. The land from which the Bosworth cow escaped is a 40 acre pasture located at the 7500 block of S.W. 61st Street, and owned by Lewis and Koelling by Warranty Deed. The pasture is improved with a fence and a 16 foot metal gate. Bosworth uses the land as pasture for her cattle.

It is uncontroverted that the pasture is approximately seven miles from defendant Lewis's residence at 3313 S.W. Clarhan Road in Topeka, Kansas. Lewis has lived at that address since 2000.

At the time of the accident, Lewis had a homeowner's "Personal Insurance Policy"

3

from Farmers, Policy No. HKS 0015709. Under the Policy, Farmers agreed to defend Lewis at 3313 S.W. Clarhan Road in Topeka, Kansas. The limit of liability for personal liability is $300,000 each occurrence.

Section 6 of the Policy defines the "Insured location" to mean:

a. The "residence premises";

b. The part of other premises, other structures and grounds used by you as a residence; and

   (1) Which is shown in the Declarations; or

   (2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with a premises described in a. and b. above;

d. Any part of the premises:

   (1) Not owned by an "insured"; and

   (2) Where an "insured" is temporarily residing;

e. Vacant land, other than farm land, owned by or rented to an "insured";

f. Land owned by or rented to an "Insured" on which a one, two, three or four family dwelling is being built as a residence for an "insured";

g. Individual or family cemetery plots or burial vaults of an "insured"; or

h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

Section 8 of the Policy defines "Residence Premises" to mean:

a. The one family dwelling where you reside;

b. The two, three or four family dwelling where you reside in at least one of the family units; or

c. The part of any other building where you reside and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

The Policy also contains an express exclusion for damages arising out of a premise which owned or rented by the insured, but which "is not an 'insured location.'"

According to the Lowes, they bought the pasture as an investment. They allowed Bosworth to continue raising her cattle there without receiving any payments from her.

*Vacant Land*

Two issues are before the court. First, the parties dispute whether the land in question was "vacant land" within the meaning of Section 6(f). If the land was not vacant land, no coverage exists under the Policy. Even if the land was vacant, the Policy does not provide coverage if it was "farm land."

The court first finds that the land was not "vacant land." The court construes the unambiguous language in an insurance policy according to its "plain, ordinary, and popular sense." *O'Bryan v. Columbia Ins. Group*, 56 P.3d 789, 792 (Kan. 2002).

There are no Kansas cases directly addressing the issue. The defendants cite to *Speth v. State Farm Fire & Cas. Co.*, 272 Kan. 751, 35 P.3d 860 (Kan.,2001), in which the court affirmed the decision of the district court that "vacant" as used in an insurance police was not ambiguous, and that policy language therefore excluded coverage for vandalism damages. The defendants argue that the pasture here should be deemed vacant, just as the house in *Speth* was also deemed vacant.

But *Speth* is not directly helpful here, because the court addressed different policy language. At issue in *Speth* was a specific policy exclusion for damage by vandalism to any "dwelling [that] has been vacant for more than 30 consecutive days." 272 Kan. at 753. Citing other "vacant dwelling" vandalism clause cases, the court held that the term "vacant" unambigously applied to a house which was unoccupied for seven months. *Id.* at 756-57. *See also Roullins v. American Reliable Ins.*, *4-5 (Kan.App. Aug. 23, 2013) (following *Speth* and holding that a house which was "full of ... personal property" but otherwise

5

unoccupied was a vacant dwelling under vandalisim clause). What makes a dwelling vacant is not necessarily the same thing as what makes land vacant.

However, *Speth* may provide some indirect illumination. In the course of its analysis, the court cited with approval to two decisions which go beyond "vacant dwellings" and address the concept of vacancy itself. Thus, the court quoted the observations in *Thompson v. Green Garden Mutual Insurance*, 261 Ill.App.3d 286, 291, 199 Ill.Dec. 336, 633 N.E.2d 1327 (1994) that "[t]he term 'vacant' has been defined as meaning generally empty or deprived of contents," as well as that in *Jerry v. Kentucky Cent. Insurance*, 836 S.W.2d 812, 815 (Tex.App.1992), "[t]he term 'vacant' means entire abandonment, deprived of contents, empty, that is, without contents of substantial utility." Thus, the Kansas Supreme Court indicated agreement with the idea that "vacant" implies both emptiness and a lack of use.

Consistent with *Thompson* and *Jerry*, the Georgia Court of Appeals determined that the term "vacant" was not ambiguous in the context of defining a similar "vacant land" clause. The term, the court stated, is

> readily understood in its plain, ordinary and popular sense. Webster's Third New Intl. Dictionary defines it generally as "to be empty, be free." In *Knight v. U.S. Fidelity, etc., Co.*, 123 Ga.App. 833, 182 S.E.2d 693 (1971), a case involving actions to recover damages for loss under fire insurance policies, this court stated, "[t]he general definition of 'vacant' is that it means empty or deprived of contents or without inanimate objects." *Id.* at 834-835, 182 S.E.2d 693. *Vaughan v. Vaughan*, 253 Ga. 76, 317 S.E.2d 201 (1984), an action to quiet title, suggested that land could be improved yet vacant. It is inapposite because the word was used to distinguish "wild" land. It was not used in the context of insurance coverage, which deals with claimed property.
>
> Couch on Insurance 2d, pp. 477-478, § 44:307 states that a homeowner's policy "may further cover 'vacant land' but clearly such coverage does not extend to land containing buildings as 'vacant land' refers to land unoccupied, unused and in the natural state." Such reasoning is sound. Insurance is a matter of risk assessment and risk taking. The presence of an affixed artificial structure on land, unoccupied, substantially alters the liability risk on the land.

*Cotton States Mut. Ins. Co. v. Smelcer*, 212 Ga.App. 376, 377, 441 S.E.2d 788 (1994). *See also Metropolitan Prop. & Cas. v. Jablonske*, 722 N.W.2d 319, 328 (Minn.App. 2006) (using

6

definition of "vacant" in Black's Law Dictionary 1546 (7th ed.1999) as "[e]mpty, unoccupied ... [a]bsolutely free, unclaimed, and unoccupied").

Applying these principles to the case at hand, it is apparent that the Bosworth pasturage was not "vacant land," since it was not empty, deprived of contents, had substantial utility, and was not in its natural state. The land had been improved by permanent fencing and a steel gate, and was used for pasturing livestock.

The two cases otherwise cited by the defendants, *Fort Worth Lloyds v. Garza*, 527 S.W.2d 195 (Tex. Civ. App. 1975) and *DeLisa v. Amica Mut. Ins. Co.*, 59 A.D.2d 380, 399 N.Y.S.2d 909 (1977), do not support a contrary result. In *Garza*, the court concluded, without analysis or citation to authority: "The word 'vacant' means unoccupied. An isolated irrigation pump sitting on the land in question does not make the land occupied." 527 S.W.2d at 199. The decision does not discuss how the land was otherwise used, or any other circumstances affecting the land, and *Garza* has been found to be unpersuasive as to how courts should interpret the phrase "vacant land." *See American Family Mut. Ins. Co. v. Page*, 366 Ill.App.3d 1112, 852 N.E.2d 874, 878-79 (Ill.App. 2 Dist. 2006).

In *DeLisa*, the plaintiffs sought coverage for an injury in a cave on land which they owned. The insurer argued that coverage was excluded because the land was not vacant. The court rejected the argument, finding that, in ordinary usage, "vacant land" means land which is "both unoccupied and unused." 399 N.Y.S.2d at 910. The court stressed that facts present in that case:

> Plaintiffs purchased the subject 190-acre plot in the Town of Knox, Albany County, on August 14, 1968. Two structures then on the premises burned down within several months of the purchase date. Also located on the land is a geological formation known as Knox Cave. The only improvements made to the land between August 14, 1968 and May 3, 1975, the date of the accident, were the erection of an iron gate at the mouth of the cave and the installation of a platform and steel ladder inside the cave. The gate was installed by the National Speleological Society whose membership had been given permission by plaintiffs to use the cave. The platform and ladder had been installed without the knowledge and consent of plaintiffs. Amica insured the subject property on an annual basis, issuing a separate policy for each calendar year. The policy for 1975 was issued when the iron gate had

deteriorated into a state of uselessness.

Thus, in *DeLisa*, the only significant improvement on the property was a gate, installed without knowledge of the owner, which had rusted to "uselessness" by the time of the accident.[1] The evidence here establishes that the pasture held some unspecified number of cattle, and that it was securely fenced. Even if Lewis and Koelling received no direct rent from the property, they have conceded they knew of Bosworth's cattle operation. The land was therefore not "unused" at the time of the accident. Rather, the land was used by Bosworth for pasturing cattle.

Moreover, the Bosworth pasture was also occupied. In this context, "vacant" does not mean unoccupied by humans. In *Tolbert v. Ryder*, 345 So.2d 548 (LaApp.3d Cir. 1977), the court explicitly found that land was not vacant when it was used for raising cattle. The defendant argued that the land in question fell within the policy pursuant to language similar to that in the present case. Observing that the land was used by numerous cattle and some farm buildings, the court found little merit in the claim, stating "[w]e are not impressed with this argument." *Id.* at 553.

---

[1] The *DeLisa* court continued its analysis, finding that the land should also be deemed vacant because the owner insureds had received no profits from the spelunkers. But this additional analysis does not seem logically grounded in the idea of "vacancy," and *DeLisa* was the subject of particular criticism in *Page*, 852 N.E.2d at 878-79:

> We do not agree with the holding in *DeLisa*, for several reasons. First, we do not agree that whether a property is used is relevant to the issue of whether it is vacant. The important inquiry focuses on the nature of the land and the objects upon it, not the way in which the land is used. Second, even if nonuse of the land were a component of vacancy, we would not see any reason to consider only use that is "materially benef[icial] to the owner." The identity of the person using the land has no bearing on whether the land is used, because the word "used" would describe the land, and thus the question of use would center on whether the land was used, not whether the owner was using it. Therefore, if the court in *DeLisa* truly relied on a definition of vacancy that required nonuse, it would not have found the land to be vacant, because it was used by the cave explorers.

Of course, it may be objected that the "extensive" cattle operation in *Tolbert* was much larger than Bosworth's herd. But this would not affect the result here, because the Policy does not include with in its coverage land which is "largely vacant,""mostly vacant," or "pretty much vacant." The policy applies to injuries arising from "vacant" land; the presence of any of cattle, whether four or 400, means the land is occupied, and hence not vacant.

Because the land was used for the production of cattle, and secured and supported this use by permanent fencing attached to the land, the court concludes that the land was not vacant land.

*Farm Land*

Even if the court were to find the land was vacant, the ultimate result would not alter because the land is "farm land" under the ordinary and plain meaning of that term.

The defendants argue that the pasture cannot be farm land, and thus is excluded from coverage under the Policy, by citing the definitions contained in K.S.A. 2-3203. That statute defines "agricultural activity" as "the growing or raising of horticultural and agricultural crops, hay, poultry and livestock, and livestock, poultry, and dairy products for commercial purposes," while "Farmland" is defined as "land devoted primarily to an agricultural activity." The defendants argue that summary judgment cannot be granted because the evidence does not show that Bosworth's cattle "were being raised for any commercial purposes." (Dkt. 31, at 9).

But there is nothing in K.S.A. 2-3203 which indicates that the Kansas legislature was attempting to create a one-size-fits-all definition of "farmland" or "agricultural activity." To the contrary, the statute is a part of the Protection of Farmland and Agricultural Activities Act, which has a very narrow purpose, namely granting commercial agricultural "protection from nuisance lawsuits." K.S.A. 2-3201. *See Finlay v. Finlay*, 18 Kan.App.2d 479,

9

482-83, 856 P.2d 183 (1993) ("Right to Farm" statute is "an effort to keep the agriculture industry from being crowded out by suburban or industrial expansion"). It accomplishes this goal by declaring that agricultural activities are not a nuisance "if consistent with good agricultural practices and established prior to surrounding nonagricultural activities." Nothing in the statue claims to establish a universal definition for "farm land" under Kansas law.

State Auto offers an opposing interpretation of "farm land," also based on stautory construction. Under K.S.A. 79-1476, "land devoted to agricultural use" is defined to

> mean and include land, regardless of whether it is located in the unincorporated area of the county or within the corporate limits of a city, which is *devoted to the production* of plants, *animals* or horticultural products, *including* but not limited to: Forages; grains and feed crops; dairy animals and dairy products; poultry and poultry products; *beef cattle*, sheep, swine and horses; bees and apiary products; trees and forest products; fruits, nuts and berries; vegetables; nursery, floral, ornamental and greenhouse products.

(Emphasis added). Unlike the "Right to Farm" nuisance statute, K.S.A. 79-1476 contains no requirement that the land be commercially used. But like the nuisance statute, 79-1476 is targeted at a very narrow subject, specifically the valuation of lands for taxation.

Words which are not expressly defined in a contract of insurance are to be interpreted according to their plain and ordinary meaning. *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003). Accordingly, the highly specialized statutory definitions cited by the parties are not directly helpful in determining the common understanding of the term "farm land."

In understanding the common usage of words, Kansas courts will turn to common dictionary understandings. *See, e.g., Lesher v. Carbon Coal*, 127 Kan. 34, 272, P. 155, (1928) (finding on the basis of Webster's Dictionary that "in common parlance [there is] not a great deal of difference" betwen the terms "meadow land" and "pasture land")

Webster's dictionary defines "farmland" as "land used or suitable for farming," and defines "farming" as "the practice of agriculture." Agriculture is "the science or art of

10

cultivating the soil, harvesting crops, and raising livestock."

This general usage usage is confirmed in prior decisions by the Kansas courts. Although the terms "pasture' and "farm land" are sometimes used in opposition, as if they were antithetical concepts, *see Appeal of Moore,* 135 Kan. 541, 11 P.2d 742 (1932) ("appellee owned a stock farm of about 80 acres, of which about 15 acres was meadow, about 15 acres farm land, and the balance pasture"), more commonly the usage indicates that a "farm" or "farm land" encompasses and includes "pasture." *See Lutz v. Independent Const. Co.*, 183 Kan. 798, 332 P.2d 269 (1958) (pollution carried "over and onto plaintiffs' farmland and dwelling, making life generally unbearable for them and resulting in various items of damage [including] injury to eight acres of pasture"); *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P.2d 652, (1940) ("The farm was particularly suited to and used for stock-raising purposes [with] about 160 acres of pasture land, about 25 acres of timber along the east side, about 45 acres of tillable land, 15 acres of orchard and the remainder was occupied by buildings"); *Poole v. Poole*, 96 Kan. 84, 150 P. 592 (1915) ("William D. Poole was a widower, and owned 2,400 acres of farmland in Geary county, where he resided, and also owned about 200 head of cattle").

More importantly, turning to their actual holdings, the court has found no Kansas decision, or decision from any other jurisdiction, stating that land used for raising domestic livestock is not farm land. To the contrary, courts have consistently held that the term "farm" is understood to include such activity. See, e.g., *Fraenkel v. Trescony*, 48 Cal.2d 378, 309 P.2d 819 (1957) ("[a] farm is generally defined 'as a tract of land used for raising crops or rearing animals — one devoted to agriculture, stock raising or some allied industry'" (quoting *Board of Supervisors v. Cothran*, 84 Cal.App.2d 679, 682, 191 P.2d 506 (1948))); *In re Clark's Estate*, 141 N.E. 2d 259, 262 (Ohio Prob. 1955), *aff'd*, 102 Ohio.App. 200, 141 N.E.2d 890 ("In general 'Farm,' means any tract of land used for raising crops or rearing animals" (quotation omitted)); *Rodgers v. Caldwell*, 142 Ill. 434,, 32 N.E. 691 (1892) ("A farm is, both

11

by the standards and in common acceptation, defined to be a body of land, usually under one ownership, devoted to agriculture, either to the raising of crops or pasturage or both").

Thus, in *Porter v. Yakima County*, 77 Wash. 299, 301, 137 P. 466, 467 (1914), the court found that in its common or "generic ... sense" the term "farm" includes animal husbandry.

> The meaning to be ascribed to this word ["farm"] is that, where live stock has a home at a farm and the owner does not reside there, it shall be assessed in its home county. Where a tract of land, whether large or small, lying wholly within a single county, is used as a unit for the breeding, rearing, and feeding of stock, and the stock are there kept during the larger part of the year, as these sheep were kept in Benton county, the tract is a farm and the stock is 'connected with a farm,' within the meaning of the statute. *A tract of land devoted to the breeding, grazing, shearing, and lambing of sheep is a farm as much as a tract that is devoted to the growing of grain or to diversified farming. In short, a tract may be a farm without the aid of a plow.* In common parlance the words 'farm' and 'ranch' are used interchangeably.

77 Wash. at 301 (emphasis added).

Similarly, in *Gordon v. Buster*, 113 Tex. 382 257 S.W. 220 (1923), the court noted that historical usage had sometimes distinguished farming and ranching (as exemplified in decisions such as *Appeal of Moore*, discussed earlier). But the court stressed that the terms were not properly considered to be separate activities. "The noun 'farm' in this country prominently means a tract of land chiefly under cultivation," it observed, "yet, as we have seen in its general scope and significance it means any tract of land used for the production of crops or the rearing of animals." 113 Tex. at 386.

> The court explained this historical evolution:
>
> Forty years ago and more in Texas there was perhaps a more distinct application of the words 'farm' and 'ranch' in the popular mind, though the general and broad meanings were recognized.... The ranching business ... under[went] great change. The broad, unlimited ranges of the West had passed. The ranches were all under fence, and the ranch hand or laborer no longer was subjected to the hazards and exposures of the range. The work was reduced to fence riding, keeping up fences, feeding and caring for the stock, and occasionally penning and shipping them. In connection with many if not most ranches, there was active farming in the way of cultivating and raising crops, particularly foodstuffs, and the ranchman frequently referred to himself as a farmer.
>
> > In all parts of Texas and the country generally, the raising of stock, especially cattle and hogs, and the growing of crops on the farm have been

12

inseparable, and the one usually indispensable to the other.

> With these conditions it is reasonable to conclude that the Legislature, in enacting [the workers compensation] statute, modeled as it was from the statute of Massachusetts (a state where the words 'farm' and 'farming' would have been understood to include stock raising), in its use of the words 'farm laborers' did not intend that they should be limited to a provincial usage, but intended them in their general and comprehensive meaning.

113 Tex. at 386-87; 257 S.W. at 222.

Where courts have held that raising animals is not farming, it was because the animals were not domestic in nature. *See Commonwealth v. Proctor*, 355 Mass. 504, 246 N.E.2d 454, 505-06 (1969) (mink ranch was not a farm, since mink are not "domesticated," which "ordinarily carries the meaning of tamed, associated with family life, accustomed to life in or near the habitations of men" (internal quotation omitted)).

Turning to cases defining "farm land" in the context of similar insurance policy language, in *Saha v. Aetna Cas. & Sur. Co.*, 427 So.2d 316, 317 (Fla. App. 1983), the court found "entirely correct" the district court's decision that the plaintiff's 22 acre tract used raising "a small herd of cattle" was farm land.

> We find nothing ambiguous about the terminology used here. The ordinary dictionary definition of a farm includes "Any land or water area devoted to the raising, breeding or production of a specified type of animal or vegetable life." The American Heritage Dictionary of the English Language (1979). The term has also been defined as: "A tract of land devoted to agriculture, pasturage, stock raising or some allied industry. Includes dairy, stock and poultry farms." Black's Law Dictionary 545 (Rev. 5th Ed.1974).

*Id.* at 316-17. The court reached this holding even though the insured, a practicing physician, raised the small herd "admittedly as a tax shelter," and "no profit was produced." *Id.* at 316, 318.

Similarly, in *State Farm Fire & Cas. Co. v. Comer*, 1996 WL 33370669, *2 (N.D. Miss. 1996), the court rejected a similar "farm land" argument, under factual circumstances similar to those presented here.

> The court fails to see how a pasture located several miles from the defendants' home could be used in connection with the residence premises. The defendants have failed to present the court with any facts which would

tend to show a connection between the cattle operation on Highway 7 and either of the premises located on Old Taylor Road. The defendants also assert that the pasture was vacant land under subsection (e). Although subsection (e) specifically states that it does not include farm land, the defendants argue that the term "farm land" only involves crop development, and does not apply to pasture land where livestock is kept. While the term "farm land" is not specifically defined in the policy, the court finds that a pasture upon which livestock is kept is clearly included within the meaning of the term "farm land."

The court finds that the term "farm land" is not ambiguous, and that in its plain, ordinary and common meaning, the pasturage in the present action is considered farm land within the meaning of Section 6 of the Policy.

IT IS ACCORDINGLY ORDERED this 18th day of March, 2014, that the defendant Kristopher Lowe is hereby dismissed from the action; plaintiff's Motion for Summary Judgment (Dkt. 29) is hereby granted.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE